IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

```
ELDEAN K. TACUBAN,              )    Civ. No. 06-00267 SOM/LEK
                               )
            Plaintiff,          )
                               )    ORDER GRANTING DEFENDANTS'
         vs.                    )    MOTION FOR SUMMARY JUDGMENT
                               )
STATE OF HAWAII; KENNETH        )
ZIENKIEWICZ, M.D.; and JOHN     )
AND/OR JANE DOES 1-10,          )
                               )
            Defendants.         )
_____ )
```

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I.        INTRODUCTION.

On April 5, 2006, Plaintiff Eldean K. Tacuban ("Tacuban") filed his Complaint against Defendants State of Hawaii ("the State") and Dr. Kenneth Zienkiewicz ("Dr. Zienkiewicz") (collectively, "Defendants"). In the Complaint, Tacuban asserts that: (1) Dr. Zienkiewicz, in his individual capacity, violated Tacuban's right to be free from cruel and unusual punishment and his right to due process, as protected by the Eighth and Fourteenth Amendments of the United States Constitution (Count 1);[1] (2) the State and Dr. Zienkiewicz, in his official and individual capacities, negligently treated his medical needs (Count 2); and (3) the State and Dr. Zienkiewicz, in his official and individual capacities, "maliciously,

_____

[1] Tacuban also alleges that Dr. Zienkiewicz violated his rights under "laws of the State of Hawaii," but does not specify in the Complaint which state laws Dr. Zienkiewicz allegedly violated.

intentionally, and/or recklessly refused to adequately, promptly, and/or reasonably treat" his medical needs (Count 3).  Tacuban prays for general, special, and punitive damages, as well as for attorneys' fees and costs.  On May 16, 2006, Defendants removed the case to this court.

On February 2, 2007, Defendants filed a motion for summary judgment on all of Tacuban's claims.  Defendants argue that Tacuban's federal claims fail because, they say, Dr. Zienkiewicz was indisputably not deliberately indifferent to Tacuban's medical needs.  Alternatively, Defendants argue that Dr. Zienkiewicz is qualifiedly immune from the federal claims.[2] Regarding the state law claims, Defendants contend that summary judgment is warranted because "[e]xpert medical testimony on the issues of causation and permanency is required, but is lacking." Defendants posit that, "[w]ith no expert medical testimony, [Tacuban's] state law claims must . . . be dismissed."

In response, Tacuban argues that summary judgment on his federal claims is not warranted because Dr. Zienkiewicz's deposition testimony establishes that "Dr. Zienkiewicz did not schedule [Tacuban] for a follow-up evaluation until four days

---

[2] Defendants also argue that Tacuban's federal claims against the State and Dr. Zienkiewicz, in his official capacity, "are barred by the Eleventh Amendment."  Motion at 9.  The court does not reach this issue, as Tacuban clarified in his opposition memorandum that the federal claims are only brought against Dr. Zienkiewicz in his individual capacity, see Opp. at 2, and the Eleventh Amendment is inapplicable to him in that capacity.

later simply because he was not scheduled to work over the weekend." Tacuban also argues that Dr. Zienkiewicz is not qualifiedly immune because "the law was clearly established that prison officials can not disregard a substantial risk of serious harm to an inmate of which they were aware." Regarding his state law claims, Tacuban argues that expert testimony is unnecessary in light of "the doctrine of res ipsa loquitur" and "the 'common knowledge' exception to the general requirement in medical malpractice actions for expert medical testimony."

Because Tacuban fails to present any evidence that Dr. Zienkiewicz violated his rights under the Eighth and Fourteenth Amendments, the court grants summary judgment on Tacuban's federal claims. The court also grants summary judgment on Tacuban's state law claims, as expert evidence is required to establish the relevant standard of care, and Tacuban failed to timely submit an expert report.

II.      LEGAL STANDARD.

Summary judgment shall be granted when

the pleadings, depositions, answers to
interrogatories, and admissions on file,
together with the affidavits, if any, show
that there is no genuine issue as to any
material fact and that the moving party is
entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see also Porter v. Cal. Dep't of Corr., 383 F.3d 1018, 1024 (9th Cir. 2004); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). One of the principal purposes of summary judgment is to identify and dispose of

factually unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See id. at 323.  A moving party without the ultimate burden of persuasion at trial--usually, but not always, the defendant--has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially falls upon the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial."  Porter, 383 F.3d at 1024 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving

4

party." <u>California v. Campbell</u>, 319 F.3d 1161, 1166 (9th Cir. 2003).

III.       <u>BACKGROUND FACTS.</u>

The underlying facts are not in dispute.

On September 14, 2004, upon entering the Oahu Community Correctional Center ("OCCC") as an inmate, Tacuban informed the medical staff that he was diabetic.  Ex. A at 1; <u>see also</u> Deposition of Dr. Kenneth Zienkiewicz (12/26/2006) ("Dr. Zienkiewicz Depo.") at 16–18.  Two days later, Tacuban told a nurse at OCCC that his "balls hurt" so much that he could "hardly stand up."  Ex. A at 2; Dr. Zienkiewicz Depo. at 21.  The nurse saw that the right side of Tacuban's scrotum was "red/purplish" and had a "hard lump."  Ex. A at 2; Dr. Zienkiewicz Depo. at 21. The nurse wrote in Tacuban's medical record that her "assessment and plan" was to schedule Tacuban for a clinical evaluation. Ex. A at 2; Dr. Zienkiewicz Depo. at 21.

That same day, Dr. Zienkiewicz met with Tacuban.  Ex. A at 2; Dr. Zienkiewicz Depo. at 21.  Tacuban told Dr. Zienkiewicz that he "started to get scrotum pain," which was followed by redness and swelling on the right side of his scrotum.  Ex. A at 2; Dr. Zienkiewicz Depo. at 22.  Dr. Zienkiewicz examined Tacuban and found that Tacuban's "right hemi-scrotum [was] swollen to twice its normal size with an 8 millimeter circular necrotic area and spreading redness."  Dr. Zienkiewicz Depo. at 22; Ex. A at 2.  Dr. Zienkiewicz also noted that Tacuban's

scrotum "was very tender," but that there was "no pus that I
could express from under the necrotic . . . area." Dr.
Zienkiewicz Depo. at 22; Ex. A at 2.

Dr. Zienkiewicz concluded that Tacuban suffered from
scrotal cellulitis. Dr. Zienkiewicz Depo. at 22; Ex. A at 2.
Dr. Zienkiewicz placed Tacuban on an antibiotic, "Cipro, 400
milligrams intravenously every 12 hours for five days," and on a
pain-killer, "Motrin, 800 milligrams three times a day for ten
days." Dr. Zienkiewicz Depo. at 22; Ex. A at 2. Dr. Zienkiewicz
also ordered that Tacuban be assigned to a "bottom bunk for one
week," because "climbing up and down to a top bunk . . . would
worsen his pain." Dr. Zienkiewicz Depo. at 22; Ex. A at 2. Dr.
Zienkiewicz also asked Tacuban to return to the clinic on Monday,
September 20, 2004, for a follow-up examination. Dr. Zienkiewicz
Depo. at 22; Ex. A at 2. Dr. Zienkiewicz told the OCCC nurses to
call him over the intervening weekend if Tacuban's condition
"gets a lot worse or if he deteriorates." Dr. Zienkiewicz Depo.
at 30.

At the September 16, 2004, appointment, Dr. Zienkiewicz
took a culture from Tacuban's scrotum and sent it to the
laboratory for testing. Dr. Zienkiewicz Depo. at 19. On
September 19, 2004, the laboratory reported[3] that three types of

_____

    [3] Although the laboratory results were reported on
September 19, 2004, the record does not indicate when Dr.
Zienkiewicz actually saw the results. _See_ Dr. Zienkiewicz Depo.
at 29 ("I'm not sure that you can say that I received that
laboratory report on the 19th.").

6

bacteria were growing on Tacuban's scrotum.  <u>Id.</u>; Ex. 4 at 13-14.
Dr. Zienkiewicz testified that, after reviewing the laboratory
results, he "was satisfied that Cipro was an appropriate
antibiotic at the time" and did not modify Tacuban's medication.
Dr. Zienkiewicz Depo. at 23-24.

Between the September 16 and September 20, 2004,
appointments, Tacuban did not stay at the infirmary.  <u>Id.</u> at 10.
Dr. Zienkiewicz explained that Tacuban "would come back to the
medical unit for the treatments, and then he would . . . return
to his housing unit."  <u>Id.</u> at 26.  Between September 16 and 20,
2004, Tacuban went to the medical unit for medication, for "blood
sugar finger stick checks," and for "wound care."  <u>Id.</u> at 26, 36.

On September 20, 2004, Dr. Zienkiewicz met with Tacuban
as scheduled.  <u>Id.</u> at 32; Ex. A at 4.  Tacuban told Dr.
Zienkiewicz that his infection "got worse," and Dr. Zienkiewicz
concurred.  Dr. Zienkiewicz Depo. at 32; Ex. A at 4.  Dr.
Zienkiewicz immediately referred Tacuban to a physician at
Queen's Medical Center and continued Tacuban's Cipro
prescription.  Dr. Zienkiewicz Depo. at 23; Ex. A at 4.

The next day, on September 21, 2004, Tacuban was
admitted to Queen's Medical Center and met with Dr. Garry B.
Peers ("Dr. Peers"), who diagnosed Tacuban with "Right Fournier's
gangrene of the scrotum."  Ex. A at 5.  Dr. Peers noted,
"Fortunately, [the gangrene] had not extended subfascially,
possibly due to the intravenous antibiotics started at OCCC."

Id.  At Queen's Medical Center, Tacuban "underwent an immediate hemiscrotectomy followed by a wound VAC wound care with an excellent result and fresh granulation and no infection spreading cephalad."  Id.  Tacuban also "underwent a delayed primary closure."  Id.  On October 5, 2004, Tacuban was discharged from Queen's Medical Center.

IV.      ANALYSIS.

        A.   Tacuban's Federal Claims.

        Dr. Zienkiewicz seeks summary judgment on Tacuban's Eighth and Fourteenth Amendment claims, brought pursuant to 42 U.S.C. § 1983.  Arguing that he was not deliberately indifferent to Tacuban's medical needs, Dr. Zienkiewicz notes that "the difference of opinion between prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim" and that his treatment "was a matter of medical judgment and does not represent cruel and unusual punishment."  Motion at 6-10.  Tacuban counters that, "despite his knowledge that [Tacuban's] groin infection required careful and frequent monitoring because [Tacuban] was at a greater risk of suffering complications because of his underlying diabetic condition, Dr. Zienkiewicz did not schedule [Tacuban] for a follow-up evaluation until four days later simply because he was not scheduled to work over the weekend."  Opp. at 12.  The court grants summary judgment in favor of Dr. Zienkiewicz.

Although Tacuban brings his claims under both the Cruel and Unusual Punishments Clause of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment, the Supreme Court has held that "the Due Process Clause affords [a plaintiff] no greater protection than does the Cruel and Unusual Punishments Clause." Whitley v. Albers, 475 U.S. 312, 327 (1986). The court therefore focuses on Tacuban's claims under the Eighth Amendment, as the parties have done in their pleadings.

"The government has an obligation under the Eighth Amendment to provide medical care for those whom it punishes by incarceration." Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc) (citing Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988)). To demonstrate an Eighth Amendment violation by failure to provide medical care, the prisoner must show that the prison official's "acts or omissions [were] sufficiently harmful to evidence a deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976) (holding that jail officials violate a prisoner's Eighth Amendment rights if they are deliberately indifferent to his serious medical needs); see also Farmer v. Brennan, 511 U.S. 825, 837 (1994) (adopting the subjective recklessness used in criminal cases as the appropriate test for deliberate indifference such that "a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health and safety"). Thus, a

"determination of 'deliberate indifference' involves an examination of two elements:  the seriousness of the prisoner's medical need and the nature of the defendant's response to that need."  See McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997).

"Such indifference may be manifested in two ways.  It may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison officials provide medical care."  Hutchinson, 838 F.2d at 394; see also Lopez, 203 F.3d at 1132; Hunt v. Dental Dept., 865 F.2d 198, 201 (9th Cir. 1989) ("[P]rison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay, or intentionally interfere with medical treatment'").

In determining deliberate indifference, a court should "scrutinize the particular facts and look for substantial indifference in the individual case, indicating more than mere negligence or isolated occurrences of neglect."  Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).  As noted by the Supreme Court:

> a complaint that a physician has been
> negligent in diagnosing or treating a medical
> condition does not state a valid claim of
> medical mistreatment under the Eighth
> Amendment.  Medical malpractice does not
> become a constitutional violation merely
> because the victim is a prisoner.  In order
> to state a cognizable claim, a prisoner must

> allege acts or omissions sufficiently harmful
> to evidence deliberate indifference to
> serious medical needs.  It is only such
> indifference that can offend "evolving
> standards of decency" in violation of the
> Eighth Amendment.

Estelle, 429 U.S. at 106; accord Lopez, 203 F.3d at 1131.

The Ninth Circuit recognizes that a "difference of
opinion between a prisoner-patient and prison medical authorities
regarding treatment does not give rise to a § 1983 claim."
Franklin v. State of Or., State Welfare Division, 662 F.2d 1337,
1344 (9th Cir. 1981).  Additionally, a difference of opinion
between medical professionals concerning the appropriate course
of treatment generally does not amount to deliberate indifference
to serious medical needs.  Sanchez v. Vild, 891 F.2d 240, 242
(9th Cir. 1989).  However, a prisoner may establish that such a
difference of opinion amounted to deliberate indifference by
showing "that the course of treatment the doctors chose was
medically unacceptable under the circumstances" and "that they
chose this course in conscious disregard of an excessive risk to
[the prisoner's] health."  Jackson v. McIntosh, 90 F.3d 330, 332
(9th Cir. 1996); see also Hamilton v. Endell, 981 F.2d 1062, 1067
(9th Cir. 1992) (stating that a prisoner may demonstrate
deliberate indifference if prison officials relied on the
contrary opinion of a non-treating physician).

In the present case, Dr. Zienkiewicz does not dispute
that Tacuban's medical needs were "serious."  Thus, the court

11

focuses, as the parties do, on whether Dr. Zienkiewicz's response to Tacuban's medical needs was deliberately indifferent.

The present record establishes that Dr. Zienkiewicz examined Tacuban on Thursday, September 16, 2004, the first day Tacuban complained about pain in his groin.  Ex. A at 2; Dr. Zienkiewicz Depo. at 21.  Dr. Zienkiewicz diagnosed Tacuban as having scrotal cellulitis, placed him on antibiotics and pain-killers, ordered that he be assigned to a "bottom bunk," and asked him to return to the clinic on Monday, September 20, 2004, for a follow-up appointment.  Dr. Zienkiewicz Depo. at 22; Ex. A at 2.  Dr. Zienkiewicz told the nurses at OCCC to contact him over the intervening weekend if Tacuban "gets a lot worse or . . . deteriorates."  Dr. Zienkiewicz Depo. at 30.

Dr. Zienkiewicz also took a culture from Tacuban's infection and sent it to the lab for testing.  Id. at 19.  The lab results satisfied Dr. Zienkiewicz that he had prescribed appropriate medication.  Id. at 23-24.

Between September 16 and 20, 2004, Tacuban did go to the medical unit to obtain medication, to have his blood sugar monitored, and to obtain "wound care."  Id. at 26, 36.  Dr. Zienkiewicz testified that he did not believe that Tacuban should have been monitored any differently during that time.  Id. at 34.  On September 20, 2004, Dr. Zienkiewicz met with Tacuban, noted that his condition had worsened, and referred him to a physician

at Queen's Medical Center, where Tacuban underwent surgery.  <u>Id.</u>
at 32.

Dr. Peers, who treated Tacuban at Queen's, found that
Tacuban's gangrene "had not extended subfascially, possibly due
to the intravenous antibiotics" prescribed by Dr. Zienkiewicz.
Ex. A at 5.  Defendants' expert, Dr. Joseph B. Marzouk ("Dr.
Marzouk"), opines:

> Mr. Tacuban developed a soft tissue infection
> of his right scrotum, was appropriately
> diagnosed as having this infection, was
> timely given appropriate antibiotics and
> adjunctive measures to eradicate and treat
> this infection.  He was seen in follow-up in
> a timely manner and when Dr. Zienkiewicz
> noted that the right scrotum was getting
> worse, he appropriately referred the patient
> to a urologist for surgical management and
> treatment.  My opinion based on my education,
> training and experience in the field of
> Infectious Diseases is that Mr. Tacuban's
> care was well within the standard of care.

Reply at 6-7.

In opposing Defendants' motion, Tacuban points only to
Dr. Zienkiewicz's deposition testimony, in which he testified
that he likely scheduled Tacuban's follow-up appointment for
Monday, September 20, 2004, because there was "an intervening
weekend [between the appointments] where I would not be at work."
Opp. at 12 (citing Dr. Zienkiewicz Depo. at 24).  But it is
undisputed that nurses were to call Dr. Zienkiewicz in for
unscheduled treatment of Tacuban if he got worse.

Without more evidentiary support, Tacuban's Eighth
Amendment claim against Dr. Zienkiewicz is based solely on a

difference of opinion between Tacuban and Dr. Zienkiewicz regarding Dr. Zienkiewicz's treatment.  Because a "difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim," Dr. Zienkiewicz is entitled to summary judgment on Tacuban's federal claims.[4]  See Franklin, 662 F.2d at 1344.

Tacuban presents no evidence of any difference of opinion between medical professionals concerning the appropriate course of treatment existed.  See Sanchez, 891 F.2d at 242.  To establish that such a difference of opinion amounted to deliberate indifference, Tacuban would have to show that "the course of treatment [Dr. Zienkiewicz] chose was medically unacceptable" and that Dr. Zienkiewicz "chose this course in conscious disregard of an excessive risk to [Tacuban's] health." See Jackson, 90 F.3d at 332; Hamilton, 981 F.2d at 1067. However, Tacuban presents no evidence that a difference of opinion between medical professionals existed, that Dr. Zienkiewicz's treatment was "unacceptable," or that Dr. Zienkiewicz chose his treatment "in conscious disregard of an excessive risk to" Tacuban's health.  The only medical opinion in the record is Dr. Marzouk's opinion that Dr. Zienkiewicz's treatment was appropriate and timely.  See Reply at 6-7; see also Dr. Zienkiewicz Depo. at 23-24 (stating that, after reviewing the

---

[4]In granting summary judgment in favor of Dr. Zienkiewicz on Tacuban's federal claims, the court does not reach Dr. Zienkiewicz's argument that he is entitled to qualified immunity from those claims.

lab results and learning of the various bacteria growing in

Tacuban's infection, he believed he prescribed the appropriate

antibiotic and did not change Tacuban's medication), 34 (stating

that, in hindsight, he did not believe that Tacuban should have

been monitored any differently between September 16 and 20,

2004); Ex. A at 5 (Dr. Peers' "clinical note" that the gangrene

"had not extended subfascially, possibly due to the intravenous

antibiotics started at OCCC").  Tacuban presents no evidence

disputing Dr. Marzouk's medical opinion.

At most, Tacuban has identified Dr. Lawrence J. Eron

("Dr. Eron") as his medical expert.  Opp. at 3.  However, Tacuban

submits no testimony or medical report by Dr. Eron stating his

expert opinion.  Tacuban submits only a letter from Tacuban's

counsel sent to Defendants' counsel, stating:

> We recently identified Lawrence J. Enron
> [sic], M.D. as [Tacuban's] medical expert in
> the above referenced matter.  As I informed
> you at the conclusion of Dr. Zienkiewicz's
> deposition the other day, Dr. Eron will
> testify as to his opinions regarding a
> hypothetical person in [Tacuban's] situation.
> Dr. Eron is <u>expected</u> to opine that given a
> patient with Mr. Tacuban's history of
> diabetes, when antibiotics are needed to
> treat an infection, the patient must be
> carefully monitored by the attending
> physician and that the two examinations over
> a period of 5 days would not meet the
> standard of medical care in the community.

Ex. 6 at 1 (emphasis added).  This letter does not state Dr.

Eron's medical opinion; it only establishes what Tacuban's

counsel <u>expects</u> Dr. Enron to opine.  Tacuban's counsel's

expectation of what Dr. Eron might opine is not evidence of Dr. Eron's opinion and would not be admissible as evidence of Dr. Eron's opinion at trial.

This court recognizes that, in <u>Fraser v. Goodate</u>, 342 F.3d 1032, 1036-37 (9th Cir. 2003), the Ninth Circuit held, "At the summary judgment state, we do not focus on the admissibility of the evidence's form.  We instead focus on the admissibility of its contents."  However, counsel's expectation is not problematic because of the mere form of the evidence.  Counsel gives no indication of the basis of his expectation, and the legitimacy of that expectation is thus in question.  This is a matter that goes straight to the content of counsel's statement, and the court does not rely on that statement.  There is thus no evidence of any difference of opinion between medical professionals regarding Dr. Zienkiewicz's treatment of Tacuban.

Even if the court considered the letter as evidence of Dr. Eron's medical opinion, the letter states only that "two examinations over a period of 5 days would not meet the standard of medical care in the community."  Ex. 6 at 1.  The letter does not indicate which symptoms might have been alleviated or whether Tacuban's condition would not have worsened had he been monitored more frequently.  Nor does it suggest that Dr. Zienkiewicz acted with conscious disregard of an excessive risk to Tacuban's health.  <u>See</u> <u>Jackson</u>, 90 F.3d at 332.  Dr. Eron's alleged opinion as stated in the letter suggests only that Dr. Zienkiewicz was

negligent in treating Tacuban.  Because a complaint that a physician has been negligent, or even grossly negligent, in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment, the court would grant summary judgment on Tacuban's federal claims even if the court considered the letter as evidence of Dr. Eron's opinion.  See Estelle, 429 U.S. at 106 ("a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment"); Wood, 900 F.2d at 1334 ("While poor medical treatment will at a certain point rise to the level of constitutional violation, mere malpractice, or even gross negligence, does not suffice.").

      B.   Tacuban's State Law Claims.

      Defendants contend that they are entitled to summary judgment on Tacuban's state law claims for negligence (Count 2) and for refusing to "adequately, promptly, and/or reasonably treat [Tacuban's] injuries" (Count 3).  Defendants argue that Tacuban "is unable to meet his burden of proof regarding his state law claims" because "[e]xpert medical testimony on the issues of causation and permanency is required, but is lacking."  Motion at 12.  Tacuban responds that, under the doctrine of res ipsa loquitor and the "'common knowledge' exception," expert evidence is not necessary in this case.  Opp. at 9.  Because neither the doctrine of res ipsa loquitor nor the common

knowledge exception applies in this case, the court grants summary judgment in Defendants' favor on Tacuban's state law claims.

"It is well settled that in medical malpractice actions, the question of negligence must be decided by reference to relevant standards of care for which the plaintiff carries the burden of proving through expert medical testimony." Craft v. Peebles, 78 Haw. 287, 298, 893 P.2d 138, 149 (Haw. 1995). "The standard of care to which a doctor has failed to adhere must be established by expert testimony because a jury generally lacks the requisite special knowledge, technical training, and background to be able to determine the applicable standard without the assistance of an expert." Id. Two exceptions to this general rule are: the doctrine of res ipsa loquitur and the "'common knowledge' exception." Id.

The doctrine of res ipsa loquitor provides that "whenever a thing that produced an injury is shown to have been under the control and management of the defendant and the occurrence is such as in the ordinary course of events does not happen if due care has been exercised, the fact of the injury itself will be deemed to afford sufficient evidence to support a recovery in the absence of any explanation by the defendant tending to show that the injury was not due to his want of care." Turner v. Willis, 59 Haw. 319, 324, 582 P.2d 710, 714 (Haw. 1978); see also Carlos v. MTL, Inc., 77 Haw. 269, 277, 883 P.2d

691, 699 (Haw. App. 1994).  Under the doctrine, "the fact of the
[injury] and the attendant circumstances may themselves furnish
all the proof of negligence that the injured person is able to
offer or that it is necessary to offer without further proof of
the defendant's duty and of his negligence to perform it."
Turner, 59 Haw. at 324, 582 P.2d at 714; Carlos, 77 Haw. at 277,
883 P.2d at 699.

> To invoke the doctrine of res ipsa loquitor in a
particular case,

> > a plaintiff must first establish the presence
> > of three conditions or elements:

> > 1.  The event must be one which ordinarily
> > does not occur in the absence of someone's
> > negligence.

> > 2.  It must be caused by an agency or
> > instrumentality within the exclusive control
> > of the defendant.

> > 3.  It must not have been due to any
> > voluntary action or contribution on the part
> > of the plaintiff.

Carlos, 77 Haw. at 277-78, 883 P.2d at 699-700.

> The first element asks "whether common knowledge or
experience is extensive enough to permit it to be said that [a
plaintiff's] condition would not have existed except for [the
defendant's] negligence."  Medina v. Figuered, 3 Haw. App. 186,
188, 647 P.2d 292, 294 (Haw. App. 1982); accord Lyu v Shinn, 40
Haw. 198, 201 (Haw. Terr. 1953) ("The test most uniformly applied
to determine whether the doctrine applies in malpractice suits is
whether all the ultimate facts alleging negligence, or some of

19

them, are required to be established by expert testimony; or whether a layman is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised.").

Hawaii appellate courts recognize that the doctrine of res ipsa loquitor applies in the following instances of malpractice:  "[w]hen an operation leaves a sponge in the patient's interior, or removes or injures an inappropriate part of his anatomy, or when a tooth is dropped down his windpipe or he suffers a serious burn from a hot water bottle, or when instruments are not sterilized."  Medina, 3 Haw. App. at 188, 647 P.2d at 294.

The common knowledge exception is similar to the doctrine of res ipsa loquitor.  Craft, 78 Haw. at 298, 893 P.2d at 149.  The exception provides that "certain medical situations present routine or non-complex matters wherein a lay person is capable of supplanting the applicable standard of care from his or her 'common knowledge' or ordinary experience."  Id.  The exception applies to "medical and surgical errors on which any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care."  Id.  According to the Hawaii Supreme Court, this exception "is rare in application," but the court recognizes that the exception applies, like the doctrine of res

20

ipsa loquitor, in the following instances:  "When an operation leaves a sponge in the patient's interior, or removes or injures an inappropriate part of his anatomy, or when a tooth is dropped down his windpipe or he suffers a serious burn from a hot water bottle, or when instruments are not sterilized."  Id.

In Count 2, Tacuban asserts that Dr. Zienkiewicz "did not exercise the degree of care or skill ordinarily exercised by others of [his] profession . . . in treating [Tacuban's] groin infection."  Complaint ¶ 22.  In Count 3, Tacuban asserts that Defendants refused to "adequately, promptly, and/or reasonably treat [Tacuban's] injuries."  Complaint ¶ 25.  Both Counts 2 and 3 must therefore be decided by reference to the relevant medical standard of care.  Tacuban asks the court to ignore the general rule that a doctor's standard of care "must be established by expert testimony" and argues that the doctrine of res ipsa loquitor and the common knowledge exception apply in this case.

Tacuban claims that Dr. Zienkiewicz acted improperly by scheduling a follow-up appointment with Tacuban four days after his initial examination, knowing that Tacuban was diabetic. Indeed, Dr. Zienkiewicz acknowledged during his deposition that he believed Tacuban was at a "somewhat greater risk of complications from the infection because of the fact that he had an underlying diabetic condition."  Dr. Zienkiewicz Depo. at 29. A layperson may have the common knowledge or experience to know

that a person suffering from greater risk of complications should be monitored by a physician once it is determined that he has an infection, but common knowledge or experience would be insufficient to determine how frequently such a patient should be monitored.

In this case, the jury would need to determine how often a patient with diabetes and scrotal cellulitis should be seen by a physician while taking prescribed Cipro and Motrin. These facts do not present a "routine or non-complex matter," and a layperson would lack "the requisite special knowledge, technical training, and background" to make this determination "without the aid of any expert's advice." Craft, 78 Haw. at 298, 893 P.2d at 149 (discussing the common knowledge exception); Medina, 3 Haw. App. at 188, 647 P.2d at 294 (discussing the doctrine of res ipsa loquitor). Under such circumstances, expert evidence is necessary, and neither the doctrine of res ipsa loquitor nor the common knowledge exception applies.

Although the deadline for Tacuban to submit an expert report was January 3, 2007, Tacuban has submitted no such report. Without an expert report, Tacuban will not be able to establish at trial the standard of care that he believes Dr. Zienkiewicz breached or refused to comply with. Additionally, the record contains Dr. Marzouk's opinion that "Tacuban's care was well within the standard of care." Reply at 7. The court therefore

grants summary judgment in favor of Defendants on Tacuban's state law claims.

        C.    The Court Delays Entry of Judgment.

Summary judgment is granted on all claims due to the lack of any evidence concerning Tacuban's expert's opinions. Given the scope of this ruling, this court delays entry of judgment to provide Tacuban enough time to file a motion for leave to extend the deadline for filing his expert report and to appeal the Magistrate Judge's decision to this court if his motion is denied.  Any extension motion must be filed with the Magistrate Judge by March 30, 2007.  The court is not, however, thereby suggesting that Tacuban should be granted leave.  Tacuban must explain not only his failure to provide a report by the January 3, 2007, deadline, but also his failure to seek an extension to date.

V.       CONCLUSION.

In light of the foregoing, the court grants summary judgment on all of Tacuban's claims.  However, judgment will not be entered against Tacuban and the case will not be closed if, by March 30, 2007, Tacuban moves for leave to extend the deadline for his expert's report.  If no such motion is filed by March 30,

2007, judgment will automatically be entered and the case will be closed immediately.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, March 19, 2007.



_____
Susan Oki Mollway
United States District Judge

**Tacuban v. State of Hawaii, et al.**, Civ. No. 06-00267 SOM/LEK; ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.